IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRITTANY S. COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:11-cv-964-MEF |
| v. | ) | (WO – Publish) |
| | ) | |
| RAYMOND ROGERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This action is brought under 42 U.S.C. § 1983 for constitutional violations of Plaintiff

Brittany S. Cooper's ("Plaintiff" or "Cooper") Eighth and Fourteenth Amendment rights

while she was an inmate at Bullock Correctional Facility in Union Springs, Alabama.

Plaintiff seeks declaratory relief and monetary damages against Defendants Raymond Rogers

("Rogers"), Sheriff of Bullock County and Administrator of the Bullock County Jail, and

Officer Curtis Pritchett ("Pritchett"), Chief Administrator of the Bullock County Jail

(collectively, "Defendants").   This matter is now before the Court on the Motion for

Summary Judgment (Doc. #35) filed by Defendants on May 1, 2013.  Having reviewed the

submissions of the parties, the applicable case law, and the record as a whole, the Court finds

that Defendants' motion is due to be GRANTED.

## I.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims in this action under 28

U.S.C. §§ 1331 (federal question) and 1343 (civil rights).  The parties do not contest personal

jurisdiction or venue, and the Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving part has met its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and

must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### III. PROCEDURAL HISTORY

On November 14, 2011, this action was removed to federal court from the Circuit Court of Bullock County, Alabama. (Doc. #2.) Plaintiff's original Complaint asserted claims against Rodgers, Pritchett, and other fictitious parties in their individual and official capacities for violations of her Fourteenth Amendment equal protection and due process rights, deliberate indifference to her serious medical needs in violation of the Eighth Amendment, and a general violation of § 1983. Defendants moved to dismiss Plaintiff's Complaint, and on February 27, 2012, the Court dismissed the fictitious party claims, all official capacity claims against Rodgers and Pritchett, and the equal protection and § 1983 claims against Rodgers and Pritchett in their individual capacities. (Doc. #14.) The remainder of Plaintiff's individual claims against Rodgers and Pritchett were dismissed with leave to refile. (Doc. #14.)

On March 7, 2012, Plaintiff filed an Amended Complaint, realleging her Eighth Amendment deliberate indifference claim as well as her Fourteenth Amendment equal protection and due process claims against Rodgers and Pritchett in their individual capacities. (Doc. #15.) Plaintiff also asserted an individual claim against Rodgers and Pritchett for

"Violation of State Law," referencing § 14-6-19 of the Alabama Code. (Doc. #15.) Defendants moved to dismiss Plaintiff's Amended Complaint, and on June 6, 2012, the Court dismissed Plaintiff's Fourteenth Amendment due process claim, as well as her state law claim under Ala. Code § 14-6-19. (Doc. #21.) Only Plaintiff's Eighth Amendment deliberate indifference claim (Count I) and her Fourteenth Amendment equal protection claim (Count II) are left pending before the Court. (Doc. #21.)

Defendants have moved for summary judgment on Plaintiff's remaining claims. (Doc. #35.) As to Plaintiff's Eighth Amendment claim, Defendants reassert their entitlement to qualified immunity,[1] arguing that the undisputed evidence demonstrates that they did not act with deliberate indifference towards Plaintiff's serious medical needs. (Doc. #35.) As to Plaintiff's Fourteenth Amendment claim, Defendants argue that Plaintiff failed to present sufficient evidence of disparate treatment. (Doc. #35.) Plaintiff opposes summary judgment as to her Eighth Amendment claim, but concedes that her Fourteenth Amendment claim fails as a matter of law. The Court will address these arguments in turn below.

---

[1] At the motion to dismiss stage of this litigation, the Court determined that Defendants were not entitled to qualified immunity on Plaintiff's Eighth Amendment claim. (Doc. #21.) However, in that opinion, the Court indicated that, if the facts developed in a manner inconsistent with the allegations in the Amended Complaint, it would be willing to revisit the qualified immunity analysis. (Doc. #21.) Defendants allege and have presented evidence demonstrating that the facts have developed in such a manner here. Thus, the Court elects to revisit its qualified immunity analysis.

## IV.  FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to Plaintiff, as the non-moving party, establish the following material facts:

In 2007, Plaintiff was convicted of theft of property in the first degree and sentenced to ten years in prison, plus five years probation.  Plaintiff was immediately placed on probation following this conviction.  On July 22, 2009, Plaintiff was arrested for violating her probation following a criminal mischief conviction and was placed in the Bullock County Jail.  On September 9, 2009, Plaintiff's probation was revoked, and she remained in the Bullock County Jail pending transfer to the Alabama Department of Corrections.  Defendant Rodgers was the Sheriff of Bullock County, Alabama and Defendant Pritchett was the Jail Administrator/Warden for the Bullock County Jail during the relevant time period.

On August 6, 2009, while in the custody of the Bullock County Jail, Plaintiff was taken to a doctor where she tested positive to a pregnancy urinalysis test, similar to an over-the-counter test purchased at a local pharmacy.  The doctor ordered that Plaintiff follow up with an OB/GYN for prenatal care.  Plaintiff informed the jail of her pregnancy diagnosis that same day.

At the time of her pregnancy test, Plaintiff was experiencing pain in her stomach and lower abdomen, similar to menstrual cramps, which was the reason she thought she may be pregnant. Plaintiff continued to experience this pain intermittently throughout her pregnancy. Other than her urinalysis test, Plaintiff's pregnancy was not confirmed through any other

means, such as a blood test, ultrasound, or vaginal exam.  Plaintiff also never heard a fetal heartbeat during her pregnancy.

Sometime after September 9, 2009, Plaintiff was placed on house arrest.[2]  On September 24, 2009, Plaintiff violated the terms of her house arrest and returned to the Bullock County Jail.  Plaintiff felt "fine" that day but informed the officer on duty that she was pregnant.  From that day forward, Plaintiff made daily verbal requests for medical attention, specifically, to see an OB/GYN for prenatal care, and to be fed fruits and other nutritional foods.[3]  Plaintiff made these requests[4] to Defendants Rodgers and Pritchett, as well as Dorothy Thomas ("Officer D. Thomas"), a corrections officer who was also

---

[2] One of the reasons Plaintiff was placed on house arrest was to allow her to sign up for and receive Medicaid and Women, Infants and Children ("WIC") for her prenatal care and nutritional food needs, two programs that would otherwise not be provided to Plaintiff had she been incarcerated.  Yet Plaintiff did not obtain any prenatal care while on house arrest.  (Doc. #37-1.)

[3] This is in contrast to the unhealthy food Plaintiff claims she was fed at the jail, such as bologna sandwiches and cereal.  Plaintiff claims she would have had access to more nutritional food outside of the jail, although there is no evidence that Plaintiff would have actually consumed such food outside of the jail.  Moreover, Plaintiff does not dispute that she was fed three meals a day while in the Bullock County Jail and that she was never subjected to hard labor, but rather performed daily cleaning chores, such as mopping.

[4] It appears that these requests–that Plaintiff be allowed to see an OB/GYN for prenatal care and that she be fed fruits and other nutritious foods–are the basis of her complaint in this case.  Indeed, Plaintiff testified:

Q.     Is your complaint because you weren't getting what you felt like was proper prenatal care?  Is that what your complaint is about here for this lawsuit?

A.     Getting nutrition, yes, sir.  I didn't get no OB/GYN, I didn't get no kind of attention, none, after they was aware of the situation, the jail.

(Doc. #37-1.)

6

Plaintiff's aunt, Veronica Harris ("Officer Harris"), another corrections officer who was her cousin, and Ruby Thomas ("Officer R. Thomas"), an unrelated corrections officer.[5]

Although Plaintiff could not recall any significant medical events that occurred between September 24, 2009, and October 6, 2009, she did recall spotting (*i.e.*, having vaginal bleeding) with pain that began on September 24 or 25, 2009.  During this time, Plaintiff's pain was sharp but slight and her bleeding mild, and she continually requested medical assistance from the jailors.[6]  Plaintiff explained that her requests for "medical attention" were essentially requests to see an OB/GYN for prenatal care because she was pregnant, but she was also concerned about her spotting and pain.  At some point between September 24 and 27, 2009, Plaintiff claims that Pritchett told her that if she continued to complain about medical care, Rodgers would send her to Tutwiler, a state women's prison, because the county did not have any money to pay for her care.  Pritchett also told Plaintiff

---

[5]  Plaintiff also mentions an Officer Martin and an Officer Reynolds.  (Doc. #37-1.)

[6]  Testimony regarding Plaintiff's requests for medical attention between September 24 and October 7, 2009, is given in Plaintiff's affidavit submitted in opposition to Defendants' motion for summary judgment.  In its reply to Plaintiff's opposition, Defendants ask the Court to strike Plaintiff's affidavit that she submitted with her response to Defendants' summary judgment motion on the grounds that it constitutes a "sham affidavit."  (Doc. #43.)  In the Eleventh Circuit, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an Affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assocs., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  However, in applying this rule, courts must distinguish between "discrepancies which create transparent shams and discrepancies which create issues of credibility or go to the weight of the evidence."  *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  Here, a comparison of Plaintiff's testimony in her deposition and subsequent affidavit do not reveal the type of clear contradictions, without explanation, that are necessary to qualify her affidavit as a "sham."  Rather, these inconsistencies raise issues regarding Plaintiff's credibility and the weight that should be given to her affidavit, which are issues the Court must reserve for the jury.  Thus, the Court will not strike Plaintiff's affidavit from consideration as a "sham."

during this time to act like he was invisible and that he was not responsible for what happened on the weekends while he was "off duty."[7]

Plaintiff's spotting and pain continued intermittently from September 24 or 25 until October 7, 2009, when her pain worsened and her bleeding became much heavier. Plaintiff's pain on October 7 developed quickly. During her deposition, Plaintiff described the pain as an 8 out of 10, and her vaginal bleeding as very heavy with clumps or clots of blood. At 11:15 on the morning of October 7, Plaintiff complained to Officer R. Thomas about her worsening bleeding and pain. Officer R. Thomas gave Plaintiff some sanitary pads and aspirin and called Rodgers to inform him of the situation. Officer R. Thomas told Plaintiff that Rodgers said Plaintiff better keep the baby inside her until she went back to court. Plaintiff then complained to her aunt, Officer D. Thomas, and she was released at 1:30 p.m. that day to obtain medical care. Plaintiff's mother took her to the emergency room at Baptist Hospital East in Montgomery, Alabama. Plaintiff claims that she was bleeding so heavily on October 7 that she bled through her clothes onto the upholstery of her mother's car while they were driving to the hospital.

Plaintiff arrived at the emergency room at approximately 4:30 p.m. on October 7, 2009. Plaintiff informed the nurse that she was about 14 weeks pregnant and had been experiencing vaginal bleeding for approximately one week. Plaintiff's chief complaint is

---

[7]  Plaintiff also alleges that, on October 1, 2009, she appeared before the Bullock County Circuit Court and informed the court that she was pregnant and experiencing pain and vaginal bleeding, but was nonetheless returned to the Bullock County Jail while the judge decided what he wanted to do on her probation revocation. (Doc. #42-1.)

reflected on the nurse's form as "vaginal bleeding times one week, no clots, little blood." (Doc. #37-1.)  Plaintiff is seen by the emergency room phyisican, Dr. Wallace Falero, and her chief complaint as reflected on the physician's form is mild "vaginal bleeding," or spotting, for about a week with no pain. Plaintiff's medical records reflect that she was indeed experiencing mild vaginal bleeding on October 7, but that she had not had previous vaginal bleeding abnormalities and that she had minimal to no accompanying pain.  A pregnancy test performed at the hospital[8] was negative, indicating that if Plaintiff had been pregnant, she miscarried before she arrived at the hospital.

Plaintiff weighed 321 pounds and was suffering from hypertension at the time of her emergency room visit on October 7.  An ultrasound was performed on Plaintiff during this visit, which confirmed the absence of fetal tissue but did show an enlarged uterus with a calcified mass.  However, because of Plaintiff's weight, the ultrasound was difficult to read and a CT scan was recommended.  Accordingly, Plaintiff underwent a CT scan that day,[9] which showed that Plaintiff was suffering from a right adnexal mass and an enlarged uterus. Plaintiff was discharged from the hospital in stable condition at 2:40 a.m. on October 8, 2009, and eventually returned to the Bullock County Jail.

The undisputed evidence in this case does not provide a definitive date on which Plaintiff miscarried.  Plaintiff's treating OB/GYN, Dr. Keith Green ("Dr. Green"), testified

---

[8]  The pregnancy test performed at the hospital was a blood test.

[9]  It is undisputed that Plaintiff would not have undergone a CT scan during her emergency room visit on October 7 had she indeed been pregnant.

that, based on her medical records and his experience, Plaintiff's miscarriage could have

occurred anywhere between July 31, 2009, and September 23, 2009,[10] suggesting that

Plaintiff's miscarriage could have occurred while she was on house arrest and not in the

custody of the Bullock County Jail.  (Affidavit of Dr. Keith Green ("Green Aff."), Doc. #37-

3.)  Dr. Green further testified that if Plaintiff was miscarrying at the time she presented to

the emergency room on October 7, her pregnancy test would have been positive (but it was

not).  (Green Aff., Doc. #37-3.)  Finally, Dr. Green testified that chronic obesity and

uncontrolled hypertension could cause an increase in the incidence of a spontaneous

miscarriage, and that there was nothing anyone could have done to prevent such a

miscarriage once it began.  (Green Aff., Doc. #37-3.)

        Plaintiff's medical records markedly contrast her deposition testimony.  The medical

records from Plaintiff's emergency room visit on October 7, 2009, reflect that her pain was

only a 2 (not an 8) on a scale of 10 and that her vaginal bleeding was light/mild with little to

no pain.  Her medical records from that visit further reflect that Plaintiff had been

experiencing this bleeding for only a week with no mention of blood clots or clumps and no

---

[10] In her opposition to Defendants' motion for summary judgment, Plaintiff moved to strike the affidavit testimony of Dr. Green as speculative.  The Court is not persuaded by this argument.  A non-expert physician may offer certain medical testimony as a lay witness.  Dr. Green's testimony is based on his personal knowledge from his review of Plaintiff's medical records, his treatment of Plaintiff, and his almost 20 years of experience in the field of obstetrics and gynecology.  Dr. Green is not providing medical opinion or causation testimony, but is rather interpreting and explaining medical records and stating known medical facts.  Thus, the Court concludes that his affidavit is admissible and not due to be stricken from consideration.  *See Eberhart v. Novartis Pharmaceuticals, Corp.*, 867 F. Supp. 2d 1241, 1252–53 (N.D. Ga. 2011) (explaining that treating physicians who are lay witnesses may offer opinions that are based on their experience as a physician and are helpful to understand their decision-making process).

mention of previous bleeding abnormalities.  Plaintiff claimed in her deposition that she told the medical staff at Baptist East the truth and that any inconsistencies between her testimony and their records are the result of mistakes in their records.  Plaintiff also maintains that, despite the medical evidence to the contrary, she miscarried on October 7, 2009.

While Plaintiff's First Amended Complaint alleges that she was "forced to suffer excruciating pain and excessive bleeding" as she waited to receive medical care, the actual evidence before the Court, including Plaintiff's deposition testimony and her affidavit, demonstrates that the injury forming the basis of Plaintiff's deliberate indifference claim is her alleged miscarriage.  Plaintiff blames Defendants for her miscarriage because she was in the Bullock County Jail at the time it happened.  Plaintiff claims that the stress she was under while in jail, the lack of medical care, and the lack of nutritious foods caused her miscarriage.  However, there is no evidence before the Court demonstrating that Plaintiff suffered a miscarriage while in the custody of the Bullock County Jail.  Even if there were, there is no evidence that Defendants caused or contributed in any way to Plaintiff's miscarriage, whether through a failure to provide prenatal care, by not feeding her fruits and other nutritious foods, by causing her stress, or by having her mop the floors.  There is also no evidence indicating that any measures could have been taken by Defendants to prevent Plaintiff's miscarriage.[11]  The only medical evidence before the Court shows that Plaintiff

---

[11] The only evidence offered to prove Defendants' culpability in connection with Plaintiff's miscarriage is Plaintiff's deposition testimony that, during her emergency room visit on October 7, 2009, Dr. Falero told her that, maybe if she had made it to the emergency room earlier, they could have prevented her miscarriage.  (Doc. #37-1.)  Because the Court is only permitted to consider at summary judgment evidence that would be admissible at trial, *see* Fed. R. Civ. P. 56(c)(1)(2), it

was pregnant as of August 6, 2009, that she suffered a spontaneous miscarriage no later than October 7, 2009, and there was nothing anyone could have done to prevent this occurrence once it began.  (Green Aff., Doc. #37-3.)  Plaintiff's nonetheless blames Defendants for her miscarriage because that is her "belief."  (Doc. #37-1.)

## V.  DISCUSSION

### A.    Eighth Amendment Deliberate Indifference Claim

As previously noted, the Court determined that Defendants were not entitled to qualified immunity on Plaintiff's Eighth Amendment claim at the motion to dismiss stage. However, the Court indicated in its Order that if the facts developed in a manner inconsistent with the allegations in the Amended Complaint, it would revisit its qualified immunity analysis. (Doc. #21.)  Defendants' summary judgment motion, and the evidence supporting it, indicate that the facts developed in such a manner here.  Thus, the Court will reexamine whether Defendants are entitled to qualified immunity on Plaintiff's Eighth Amendment deliberate indifference claim.

#### 1.    Qualified Immunity

The doctrine of qualified immunity provides that government officials who are performing discretionary functions are generally shielded from liability for civil damages

---

cannot consider this testimony, as it is speculative and also constitutes hearsay not subject to any exception under the rules of evidence.  *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); Fed. R. Evid. 802 (recognizing that hearsay is generally not admissible); Fed. R. Evid. 803(4) (providing hearsay exception for statements made for medical diagnosis or treatment, which is not applicable here); *see also Hodge v. Secretary, Fla. Dept. of Corrections*, 464 Fed. App'x 810, 813 (11th Cir. 2012).

insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009). To invoke qualified immunity, the official must first establish that he was acting within the scope of his discretionary authority when the alleged constitutional violation occurred. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). "'If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'" *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)). This requires a plaintiff to prove that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Id.* "'The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)).

### a.    Discretionary Function

Given the above, the first issue the Court must resolve is whether Defendants were acting within the scope of their discretionary authority when the alleged violation of Plaintiff's constitutional rights occurred.  An official claiming qualified immunity will be considered to have acted within his discretionary authority if he demonstrates "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988).  Courts should not be "overly narrow" in interpreting this requirement. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994).  Instead, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).   "[T]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear." *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

Plaintiff alleges in her First Amended Complaint that Defendants were "at all times relevant hereto acting as instrumentalities of the Executive Branch of the Government in the state of Alabama" and that they "interacted with the Plaintiff in the line and scope of their duties."  (Doc. #15, ¶¶ 5, 11.)  While Plaintiff argues for the first time in her opposition to Defendants' summary judgment motion that Defendants were not acting within their discretionary authority at the time her constitutional rights were violated, the Court is not persuaded by this argument.  It has long been held that the decision to bestow or deny

medical services to prisoners, such as Plaintiff, is a discretionary function for purposes of qualified immunity analysis.  *See Townsend*, 601 F.3d at 1158; *Nelson v. Prison Health Servs., Inc.*, 991 F. Supp. 1452, 1461 (M.D. Fla. 1997).  Accordingly, the Court finds that Defendants Rodgers and Pritchett were acting within the scope of their discretionary authority at the time Plaintiff's constitutional rights were allegedly violated.  Therefore, Defendants are entitled to the defense of qualified immunity unless Plaintiff can show that (1) there was indeed a violation of her constitutional rights; and (2) the illegality of this violation was clearly established at the time of the incident.  *See Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012).  As noted above, federal courts have discretion as to which of these two prongs to decide first.  *See Pearson*, 555 U.S. at 236.  Because resolving the first prong will dispose of Plaintiff's Eighth Amendment claim, the Court will address it first.

### b.    Constitutional Violation

Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment.[12]  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prove a claim of deliberate indifference, Plaintiff must "shoulder three burdens."  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  First, Plaintiff must satisfy the objective component by showing that she had a serious medical need.  *Id.* (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)).  Second, Plaintiff must satisfy the subjective component by showing that Defendants Rodgers and Pritchett acted with deliberate indifference to her serious

---

[12] Defendants Rodgers and Pritchett, as Sheriff of Bullock County and Chief Administrator of its jail, respectively, are bound by the Eighth Amendment.

medical need.  *Id.*  Third, as with any tort claim, Plaintiff must show that her injury was

caused by Defendants' wrongful conduct. *Id.* (citing *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579,

1582 (11th Cir. 1995)).

Plaintiff has met her burden as to both the objective and subjective elements of her

deliberate indifference claim.  First, the evidence, taken in the light most favorable to

Plaintiff, establishes that she was suffering from a serious medical need.  "A medical need

that is serious enough to satisfy the objective component 'is one that has been diagnosed by

a physician as mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention.'"  *Id.* (quoting *Hill v. Dekalb Reg'l*

*Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).  Plaintiff claims that she experienced

spotting and pain throughout her pregnancy, and that her bleeding became so heavy and her

pain so intense on October 7, 2009, that she had to seek emergency medical attention, at

which time she learned that she had suffered a miscarriage.  Prolonged vaginal bleeding,

particularly when accompanied by pain, is a serious medical condition that is indeed "so

obvious that even a lay person would easily recognized the necessity for a doctor's

attention."  *See Goebert*, 510 F.3d at 1326–27; *Townsend*, 601 F.3d at 1158; *Archer v.*

*Dutcher*, 733 F.2d 14, 17 (2nd Cir. 1984); *Pool v. Sebastian Cnty.*, 418 F.3d 934, 944–45

(8th Cir. 2005).  While Defendants attempt to cast Plaintiff's vaginal bleeding and pain in

a "routine" light by pointing to evidence that Plaintiff did not request medical attention

specifically for her vaginal bleeding, but rather made general requests to see an OB/GYN for

prenatal care, Plaintiff's failure to be overly specific or to use detailed nomenclature in

16

requesting to see a doctor does not lessen the seriousness of her medical condition.  This is particularly true when Plaintiff's testimony reveals that she believed her almost daily requests to see an OB/GYN for prenatal care "covered all of it, over all," including her concerns about her vaginal bleeding and pain.  (Doc. #37-1.)

Second, Plaintiff has met her burden of establishing that Defendants Rodgers and Pritchett acted with deliberate indifference to her serious medical need.  To prove that a defendant acted with deliberate indifference to a serious medical need, a plaintiff must establish: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.  *Goebert*, 510 F.3d 1326–27.  Taking the evidence in the light most favorable to Plaintiff, not only were Defendants aware of her pregnancy (the jail had taken Plaintiff to the doctor at the time she tested positive for pregnancy, and she provided the jail with that diagnosis the very same day), but they were also aware of the vaginal bleeding and pain she was experiencing during her pregnancy.  Plaintiff testified that she made almost daily verbal requests to Defendants and other correctional officers to see an OB/GYN for medical attention, and that she complained to them about her vaginal bleeding.  Defendants disregarded that risk of harm by ignoring Plaintiff's requests for medical attention or responding to them with threats (*i.e.*, being sent to Tutwiler women's prison) or callous remarks (*i.e.,* Rodgers saying that Plaintiff better keep the baby inside her, and Pritchett telling Plaintiff he was invisible or off duty) until October 7, 2009, the day Plaintiff was released to obtain medical care.  Taking the above in the light most favorable to Plaintiff, she has met the subjective component of her deliberate

17

indifference claim.

However, Plaintiff has not carried her burden as to the causation element of her deliberate indifference claim. Like any tort claim, Plaintiff must show that her injury was caused by Defendants' wrongful conduct. *See Goebert*, 510 F.3d at 1326. In this case, the evidence shows that Plaintiff was pregnant on August 6, 2009, and that she had suffered a complete abortion by October 7, 2009. There is no evidence establishing exactly when Plaintiff suffered her miscarriage, what caused it, or whether Plaintiff was even in the custody of the Bullock County Jail when she miscarried. Plaintiff claims that the stress of being in jail, the lack of prenatal care, and the failure of the jail to feed her fruits and other nutritious foods caused her miscarriage. Yet, other than Plaintiff's own speculation, there is no evidence, much less substantial evidence, to support her contention that Defendants caused her injury in this case–her miscarriage.[13] Rather, Plaintiff testified that this is simply her "belief." This type of conjecture is not enough to establish the requisite causation element of Plaintiff's deliberate indifference claim. *See Sun v. Giardot*, 237 Fed. App'x 415, 417 (11th Cir. 2007) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment."); *Vanfleet v. Gilo*, 2013 WL 1775551, at *4 (N.D. Fla. Feb. 25, 2013)

_____

[13] To be clear, while Plaintiff's First Amended Complaint alleges that she was "forced to suffer excruciating pain and excessive bleeding" as she waited to receive medical care, the actual evidence before the Court, including Plaintiff's deposition testimony and sworn affidavit, demonstrates that the injury forming the basis of Plaintiff's deliberate indifference claim is her alleged miscarriage. Plaintiff testified that her actual complaint in this lawsuit was that she did not get proper prenatal care, which she believes caused her miscarriage, not that she was forced to suffer excruciating pain and excessive bleeding.

(recognizing that Plaintiff's mere belief that a doctor was negligent is not enough to establish a deliberate indifference claim absent any supporting facts).

Moreover, there is no evidence, medical or otherwise, that Defendants did anything to cause or contribute to Plaintiff's miscarriage.  There is no evidence suggesting that, if Plaintiff had been given fruits or other nutritious foods to eat while in jail, or if she been taken to see an OB/GYN the very first time she requested medical care, the result of her pregnancy would have been any different.  Even Plaintiff admits that she has no evidence demonstrating that Defendants caused her miscarriage or any other injury.  While the Court certainly sympathizes with the loss of a child, it cannot overlook the fact that Plaintiff has failed to produce evidence of even a tenuous causal connection between her alleged injury in this case–her miscarriage–and Defendants' actions.  Accordingly, the Court finds that Plaintiff has failed to meet her burden as to her deliberate indifference claim, and, therefore, Defendants are entitled to the defense of qualified immunity as to this claim.  Therefore, summary judgment is due to be granted as to Plaintiff's Eighth Amendment deliberate indifference claim as alleged in Count I of the First Amended Complaint.

**B.      Fourteenth Amendment Equal Protection Claim**

Count II of Plaintiff's Amended Complaint asserts a claim against Defendants for violation of her due process rights under the Fourteenth Amendment to the United States Constitution.  Specifically, Plaintiff alleges that Defendants treated her differently than other inmates based upon her gender by failing to provide her the medical care she needed during her pregnancy.  However, at summary judgment, Plaintiff conceded her equal protection claim and presented the Court with no substantial evidence to create a genuine dispute of material fact as to this claim.  (*See* Doc. #42, at 11.)  Therefore, Defendants' summary judgment motion is due to be granted as to Plaintiff's Fourteenth Amendment equal protection claim as alleged in Count II of the First Amended Complaint.

## VI.  CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Doc. #35) is GRANTED, and Plaintiff's First Amended Complaint is dismissed in its entirety.  The pretrial hearing and trial in this case is CANCELLED.  A final judgment consistent with this Memorandum Order and Opinion will be entered separately.

DONE this the 4th day of September, 2013.

/s Mark E. Fuller<br>
UNITED STATES DISTRICT JUDGE